IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br>Department of Justice, Antitrust Division,<br>325 7th Street, N.W.; Suite 300<br>Washington, DC 20530,<br><br>          Plaintiff,<br><br>     v.<br><br>**ECAST, INC.**<br>49 Geary Street, Mezzanine<br>San Francisco, CA 94108<br><br>and<br><br>**NSM MUSIC GROUP, LTD.**<br>3 Stadium Way<br>Elland Road<br>Leeds<br>West Yorkshire<br>United Kingdom<br>LS11 0EW,<br><br>          Defendants. | Civil No.: _____ |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil antitrust action to obtain equitable relief against defendants Ecast, Inc. ("Ecast") and NSM Music Group, Ltd. ("NSM"), alleging as follows:

### NATURE OF THE ACTION

1.      This action challenges an agreement between Ecast and NSM to not compete in the U.S. market for digital jukebox platforms.

2. A digital jukebox is an Internet-connected device installed in bars and restaurants that is capable of playing digital music files that are either stored on a hard drive inside the jukebox, or are downloaded from a remote server via the Internet. The jukebox consists of two primary components, a physical jukebox and a "platform," which is the term the industry applies to the combination of the software that powers the jukebox and the licensed collection of music that the jukebox is capable of playing at the request of bar or restaurant patrons.

3. At all times relevant to this complaint, defendant Ecast was one of only two digital jukebox platform providers in the United States. Ecast does not manufacture physical jukeboxes and has instead elected to work with existing jukebox manufacturers. Ecast's manufacturing partners produce digital jukeboxes incorporating Ecast's platform and distribute the jukeboxes through their established distribution networks to "operators," which purchase the jukeboxes and install them in bars and restaurants.

4. In 2002, Ecast was informed by its then manufacturing partner of the manufacturer's plans to terminate its supply relationship with Ecast. Ecast turned to other jukebox manufacturers to avoid an interruption in the flow of digital jukeboxes powered by its platform into the digital jukebox marketplace.

5. At that time, defendant NSM, a jukebox manufacturer, was developing its own distinctive digital jukebox platform, which it planned to incorporate into its physical jukeboxes and release in the United States in competition with Ecast.

6. In the fall of 2002, Ecast initiated negotiations with defendant NSM regarding a possible manufacturing agreement. NSM expressed some interest in manufacturing digital jukeboxes incorporating Ecast's platform, but Ecast and NSM disagreed on how Ecast should

compensate NSM in such a relationship. During the negotiations, Ecast requested that NSM agree to abandon its plans to enter the U.S. market in return for an upfront payment. NSM accepted Ecast's condition and entered an agreement with Ecast in February 2003.

7. NSM's agreement to manufacture only Ecast-powered digital jukeboxes caused it to abandon its plan to incorporate its own distinctive digital jukebox platform into its physical jukeboxes and enter the United States market.

8. Defendants' agreement constitutes an unreasonable agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

9. The United States seeks an order to prohibit defendants from enforcing and adhering to any agreement restraining competition between them and to obtain other equitable relief necessary to restore competition, potential or actual, for the benefit of digital jukebox purchasers throughout the United States.

**JURISDICTION AND VENUE**

10. The Court has subject matter jurisdiction under Section 4 of the Sherman Act, 15 U.S.C. § 4, and under 28 U.S.C. §§ 1331 and 1337 to prevent and restrain the defendants from continuing to violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

11. Venue is proper in this judicial district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b)(1), (c) because defendants transact or have transacted business here.

**DEFENDANTS**

12.     Defendant Ecast, Inc. is a privately held company organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California.

13.     Defendant NSM Music Group, Ltd. is a company incorporated under the laws of the United Kingdom. Since 2002, NSM has offered a digital jukebox powered by an NSM platform in the United Kingdom. NSM's U.S. subsidiary, NSM Music, Inc., is based outside of Chicago, Illinois.

**INDUSTRY BACKGROUND**

14.     Digital jukeboxes emerged in the United States in 1997. Because of the advantages of digital jukeboxes both to consumers and to the "operators" that purchase the jukeboxes and install them (along with other coin-operated devices) in bars and restaurants, the pace of conversion from CD jukeboxes to digital jukeboxes is expected to increase rapidly.

15.     Digital jukeboxes provide consumers access to a dramatically broader selection of music than they have available to them through CD jukeboxes. Jukeboxes powered by Ecast's platform, for example, allow consumers to choose from among 300 albums stored on each jukebox's hard drive. For an additional fee, consumers can download any of the additional 150,000 songs that Ecast stores on its remote servers. Consumers can also pay an additional fee to have their song choice jump to the front of the song queue. These features are not only popular with consumer users of digital jukeboxes, they also increase the revenue opportunities available to their operator purchasers.

16. After making a one-time payment to a jukebox distributor (the traditional intermediary between the manufacturer and the operator), operators then pay monthly fees to the platform provider to maintain access both to the music collection the platform provider licensed from U.S. copyright holders and to the proprietary software that allows the operator to remotely control the jukebox and the special features associated with it.

17. At all times relevant to the complaint, Ecast had only one other digital jukebox platform competitor, with which it competed on the monthly fee collected from operators. Ecast and its competitor each charged a monthly fee based on a percentage of the revenues generated by the jukebox. Ecast also competed on the special features available through jukeboxes incorporating its platform.

18. Under Ecast's business model, it sought to collaborate closely with and take advantage of the manufacturing expertise and distribution networks maintained by traditional jukebox manufacturers. Ecast believed that by combining the traditional jukebox companies' strengths with Ecast's Internet technology capabilities and the music collection it licensed from U.S. copyright holders, they could provide high-quality, Ecast-powered jukeboxes to the U.S. market more quickly than if Ecast had proceeded on its own.

19. Digital jukebox platforms provide to digital jukebox operators the software that powers digital jukeboxes and the music licensed from U.S. copyright holders that consumers can access through the jukebox. Because of the unique features and the enhanced revenue opportunities that digital jukeboxes offer to operators, if a hypothetical monopolist of digital jukebox platforms were to raise price by a small, but significant amount, digital jukebox manufacturers would not turn to other types of platforms (such as CD libraries). Neither would

such a price increase cause operators of digital jukeboxes to switch to possible substitutes (such as CD jukeboxes). Additionally, if such a hypothetical digital jukebox platform monopolist raised its price, digital jukebox manufacturers that sold in the United States and operators that installed jukeboxes in the United States would not switch to platform providers that did not hold the necessary licenses to the U.S. copyrights associated with the music played by the jukebox.

### The Illegal Noncompete Agreement

20.    In the fall of 2002, defendant NSM was preparing to enter the U.S. digital jukebox market using its own platform in competition with Ecast and the other platform competitor. It had begun obtaining the U.S. copyright licenses necessary to provide a jukebox platform in the United States and had secured a line of credit to pay advances demanded by the copyright holders. NSM had also modified its U.K. jukebox and platform for release in the U.S. market, and it had completed a prototype of its planned digital jukebox for demonstration at trade shows.

21.    NSM saw a significant market opportunity to distinguish itself from Ecast and the other platform competitor by offering a more operator-friendly business model for the digital jukebox platform than the incumbents' revenue-sharing model. NSM's plan was to release a digital jukebox platform at a fixed monthly cost to operators. Operators had expressed interest in NSM's platform and several of them delayed purchases of jukeboxes incorporating Ecast's platform in anticipation of NSM's launch. NSM's commitment to a distinctive business model attractive to operators promised to generate competitive responses from the existing platform providers.

22.    At an industry trade show in September 2002, NSM displayed a prototype of a digital jukebox and platform that it intended to release in the U.S. market. Ecast, having learned

of its manufacturing partner's plans to terminate Ecast's only manufacturing relationship, approached NSM at the September 2002 trade show and proposed that NSM produce digital jukeboxes that would be powered by Ecast's platform.

23.     Given its efforts to introduce a NSM-powered digital jukebox, NSM demanded appropriate compensation from Ecast before it would agree to assist Ecast by producing Ecast-powered digital jukeboxes. During subsequent negotiations, Ecast agreed to make a significant upfront cash payment to NSM in return for NSM's agreement to manufacture only East-powered digital jukeboxes and not compete against Ecast.

24.     After those negotiations, Ecast forwarded a letter of intent to NSM. The December 31, 2002, letter of intent contained a provision that stated:

> NSM agrees that it will abandon its attempts to acquire music licenses for the U.S. market (the "Territory") and advise all content providers and licensors with which NSM has entered licenses with [sic] that it has abandoned entering the US market with its own digital music platform. NSM also agrees that for as long as Ecast offers the Ecast Platform in the Territory NSM will not produce a competing product in the Territory.

25.     Ecast sought through the noncompete provision to prevent NSM from entering and disrupting the digital jukebox platform marketplace. NSM's board thereafter approved the deal with Ecast that included the noncompete provision as quoted above.

26.     After agreeing with Ecast to manufacture Ecast-powered jukeboxes exclusively and not to proceed with its own entry into the U.S. platform market, NSM fired the two employees that had been responsible for its planned entry. Upon learning of NSM's action, Ecast reneged on its deal with NSM and refused to make the upfront payment to NSM as previously promised.

27. Ecast and NSM subsequently negotiated a second agreement that also contained a noncompete provision obligating NSM to produce only Ecast-powered digital jukeboxes. The second agreement also called for Ecast to make a smaller upfront payment to NSM and contained a license by NSM to Ecast of a patent relating to digital jukebox technology.

28. NSM did not, and has not, entered the U.S. market with its own digital jukebox using its platform. Its presence in the United States is only as a manufacturer and distributor of CD jukeboxes and digital jukeboxes powered by Ecast's platform.

## CAUSE OF ACTION
### (Violation of Section 1 of the Sherman Act)

29. The United States hereby incorporates paragraphs 1 through 28.

30. The anticompetitive effects of defendants' noncompete agreement outweigh any procompetitive benefits offered by that agreement.

31. The noncompete agreement prevented NSM from entering the market for digital jukebox platforms and denied to U.S. operators and jukebox users the benefits of competition among NSM and existing participants in the market. The noncompete agreement offered few, if any, procompetitive benefits to weigh against the harm to U.S. consumers.

32. Defendants' agreement unreasonably restrained competition in the digital jukebox platform market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## REQUESTED RELIEF

The United States requests that:

(A) the Court adjudge and decree that the defendants' agreement not to compete constitutes an illegal restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act;

(B) the defendants be permanently enjoined and restrained from enforcing or adhering to existing contractual provisions that restrict competition between them;

(C) each defendant be permanently enjoined and restrained from establishing any agreement restricting competition between it and another digital jukebox platform competitor;

(D) the United States be awarded such other relief as the Court may deem just and proper to redress and prevent recurrence of the alleged violation and to dissipate the anticompetitive effects of Ecast's and NSM's illegal agreement; and

(D) the United States be awarded the costs of this action.

Dated: September 2, 2005.

_____
THOMAS O. BARNETT
Acting Assistant Attorney General

_____
J. ROBERT KRAMER II
Director of Operations

_____
JOHN R. READ, Chief
NINA HALE, Assistant Chief
Litigation III

_____
DAVID C. KULLY (DC Bar # 448763)
JILL A. BEAIRD

Attorneys for the United States
United States Department of Justice
Antitrust Division
325 7th Street, NW; Suite 300
Washington, DC 20530
Telephone: (202) 305-9969
Facsimile: (202) 307-9952