## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** )<br>Department of Justice, Antitrust Division, )<br>325 7th Street, N.W.; Suite 300 )<br>Washington, DC 20530, )<br> )<br>       Plaintiff, )<br> )<br>     v. )<br> )<br>**ECAST, INC.** )<br>49 Geary Street, Mezzanine )<br>San Francisco, CA 94108 )<br> )<br>and )<br> )<br>**NSM MUSIC GROUP, LTD.** )<br>3 Stadium Way )<br>Elland Road )<br>Leeds )<br>West Yorkshire )<br>United Kingdom )<br>LS11 OEW, )<br> )<br>       Defendants. )<br> ) | Civil No.: _____ |

## COMPETITIVE IMPACT STATEMENT

The United States, pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act

("APPA"), 15 U.S.C. § 16(b), files this Competitive Impact Statement relating to the proposed

Final Judgment submitted for entry in this civil antitrust proceeding.

On September 2, 2005, the United States filed a civil antitrust Complaint pursuant to

Section 4 of the Sherman Act, as amended, 15 U.S.C. § 4, against Ecast, Inc. ("Ecast") and NSM

Music Group, Ltd. ("NSM"). The Complaint alleges that defendants entered into a noncompete

agreement that caused NSM not to proceed with its plans to enter the U.S. digital jukebox

platform market and compete with Ecast. That agreement, as the Complaint further alleges, is a restraint of interstate trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

The Complaint seeks an order to prohibit defendants from enforcing or adhering to any agreement restraining competition between them, and other equitable relief necessary to prevent a recurrence of the illegal conduct.

The United States filed simultaneously with the Complaint a proposed Final Judgment, which constitutes the parties' settlement. This proposed Final Judgment seeks to prevent defendants' illegal conduct by expressly enjoining them from enforcing or adhering to their existing noncompete agreement, prohibiting them from establishing future noncompete agreements with digital jukebox platform competitors, and requiring each to establish a rigorous antitrust compliance program.

The United States, Ecast, and NSM have stipulated that the proposed Final Judgment may be entered after compliance with the APPA, unless the United States withdraws its consent. Entry of the proposed Final Judgment would terminate this action, except that this Court would retain jurisdiction to construe, modify, and enforce the proposed Final Judgment and to punish violations thereof.

## I. DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION OF THE ANTITRUST LAWS

### A. Defendants

#### 1. *Ecast*

Ecast is a San Francisco-based, privately held company organized under the laws of the State of Delaware. It developed a digital jukebox platform that supplies the software and music

for jukeboxes manufactured by traditional jukebox manufacturers. Ecast refers to jukeboxes that incorporate its platform as "powered by Ecast."

        2.    *NSM*

NSM is a jukebox manufacturer based in the United Kingdom. It conducts business in the United States through its operating subsidiary, NSM Music, Inc., based outside of Chicago, Illinois.

**B.**    **The Digital Jukebox Industry**

Digital jukeboxes are Internet-connected devices installed in bars and restaurants that are capable of playing digital music files that are either stored on a hard drive inside each jukebox or are downloaded from a remote server via the Internet. Digital jukeboxes consist of two primary components, a physical jukebox and a "platform," which is the term the industry applies to the combination of the software that powers the jukebox and the licensed collection of music that the jukebox is capable of playing.

As is the case with CD jukeboxes and most other coin-operated devices found in bars and restaurants, digital jukeboxes are purchased, installed, and maintained by 3,000, mostly local businesses called "operators." Operators purchase both CD and digital jukeboxes from distributors, which maintain relationships with jukebox manufacturers.[1] When operators elect to purchase a digital jukebox, they incur – in addition to the one-time, out-of-pocket payment to the distributor – an obligation to make recurring monthly payments to the platform provider to

---

[1] Operators then negotiate with bars and restaurants for space in their establishments in which to place the digital jukeboxes.

maintain continuous access to the provider's proprietary software and to the music collection that the platform provider licensed from U.S. copyright holders.

There are roughly 15,000 digital jukeboxes in the United States. The popularity of digital jukeboxes to consumers, and their ability to generate greater revenue for the operator than CD jukeboxes, lead many in the industry to predict the pace of digital jukebox adoption to increase in the coming years.

Digital jukeboxes offer consumers a song selection dramatically larger than CD jukeboxes. Ecast, for example, preloads jukeboxes incorporating its platform with 300 albums, but also permits consumers to access, for a higher price, a licensed collection of 150,000 additional songs that it stores on its remote servers. Ecast-powered jukeboxes also allow consumers to pay to jump to the front of the song queue. Because operators can control the song selection on their digital jukeboxes from a remote location over the Internet, digital jukeboxes also relieve operators of the need to visit each of their jukeboxes to load new releases or holiday favorites.

Ecast released its platform in the United States in 2001. It did so under an agreement with a jukebox manufacturer, which manufactured and distributed (through the manufacturer's established chain of distributors) digital jukeboxes incorporating the Ecast platform. When the manufacturer notified Ecast in 2002 that it intended to terminate their agreement, Ecast immediately sought to avoid an interruption in the delivery of Ecast-powered digital jukeboxes to the U.S. market by finding another manufacturing partner.

C.    **The Illegal Noncompete Agreement**

At a September 2002 industry trade show, NSM displayed a prototype of a digital

jukebox and platform that it intended to release in the U.S. market.  By that time, NSM was

actively negotiating with U.S. copyright holders to obtain the licenses it needed to provide music

to consumers through its digital jukebox platform, and had secured a line of credit to pay

advances typically demanded by the copyright holders.  NSM had also modified the digital

jukebox and platform it had previously released in the United Kingdom for release in the United

States.  It had publicly communicated its intention to enter the U.S. market, and it was internally

committed to proceeding with those plans.

Ecast approached NSM at the September 2002 industry trade show and proposed that

NSM produce digital jukeboxes which would be powered by Ecast's platform.  During

subsequent negotiations, Ecast agreed to make a significant upfront payment to NSM, provided

that NSM abandon its entry plans in the U.S. and agree not to compete against Ecast.  After

further negotiations on those terms, Ecast submitted to NSM a letter of intent calling for an

upfront payment by Ecast of $700,000, and containing the following noncompete agreement:

> NSM agrees that it will abandon its attempts to acquire music licenses for the U.S.
> market (the "Territory") and advise all content providers and licensors with which
> NSM has entered licenses with [sic] that it has abandoned entering the US market
> with its own digital music platform.  NSM also agrees that for as long as Ecast
> offers the Ecast Platform in the Territory NSM will not produce a competing
> product in the Territory.

To Ecast, the principal motivation for requesting the noncompete provision was to

prevent NSM from entering and disrupting the digital jukebox platform market.  NSM went

ahead and approved the deal with Ecast that included the above-quoted noncompete provision.

Pursuant to the agreement, NSM thereafter ceased all efforts to enter the U.S. market with its own digital jukebox platform. NSM also fired the two employees responsible for its planned entry. Those employees were the only NSM representatives involved in its copyright license negotiations, its successful efforts to obtain financing necessary to pay advances to copyright holders, and its communications with U.S. operators and distributors concerning NSM's impending U.S. entry.

Ecast recognized that without those employees, NSM no longer possessed the ability to enter quickly with its own platform. Ecast then refused to pay NSM the full $700,000 as agreed. Ecast and NSM subsequently renegotiated the terms of their agreement such that NSM would remain prohibited from entering the U.S. market with its own digital jukebox platform with smaller payments from Ecast. The revised agreement also included a license by NSM to Ecast of a patent concerning digital jukebox technology.

**D.    Defendants' Noncompete Agreement Is an Unreasonable Restraint of Trade**

Noncompete agreements between competitors can violate Section 1 of the Sherman Act. In this case, the noncompete agreement was entered into in conjunction with an agreement to jointly produce and distribute a product. The Department analyzed this noncompete agreement pursuant to the rule of reason because it was reasonably related to the venture and enhanced its efficiency. Under the rule of reason, the Department considers "all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918). After consideration of the circumstances in this case, the Department concluded that the

noncompete agreement significantly suppressed competition and that harm to competition outweighed the procompetitive benefits of the agreement.

The noncompete agreement between Ecast and NSM forced NSM to abandon its efforts to enter the U.S. market with its own digital jukebox platform. Many operators had expressed great interest in NSM's entry because NSM intended to utilize a more attractive pricing model for its jukebox platform (a flat-price model as opposed to a percentage-of-revenue model) than either Ecast or its only U.S. platform competitor. This and other significant potential benefits to consumers were eliminated by the noncompete provision. The procompetitive benefits of the venture were very limited. Accordingly, the Department concluded that the anticompetitive effects of the noncompete agreement outweighed the procompetitive effects.

## II.    **EXPLANATION OF THE PROPOSED FINAL JUDGMENT**

The Antitrust Division typically seeks, through an enforcement action, to restore the competitive conditions that existed prior to defendants' establishment of their illegal agreement. The Antitrust Division cannot require NSM to enter the U.S. digital jukebox platform market, but believes it is important to eliminate the artificial impediments to NSM's ability to do so in the future. The proposed Final Judgment thus enjoins defendants from enforcing or adhering to this or any other noncompete agreement that restricts NSM's entry into the U.S. digital jukebox platform market. The proposed Final Judgment also prohibits defendants from establishing noncompete agreements with other digital jukebox platform competitors and imposes a rigorous antitrust compliance program upon each defendant.

## III.    REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in a federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorney's fees.  Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action.  Under provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent lawsuit that any private party may bring against the defendants.

## IV.    PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and the defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent.  The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment.  Any person who wishes to comment should do so within 60 days of the date of publication of this Competitive Impact Statement in the *Federal Register*.  The United States will evaluate and respond to the comments.  All comments will be given due consideration by the United States, through the Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to entry.

The comments and the response of the United States will be filed with the Court and published in the *Federal Register*. Written comments should be submitted to:

> John Read
> Chief, Litigation III Section
> Antitrust Division
> United States Department of Justice
> 325 Seventh Street, NW, Suite 300
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## V.    ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits of its Complaint against the defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against Ecast and NSM. However, the United States is satisfied that the relief provided in the proposed Final Judgment will prevent a recurrence of conduct that restricted competition in the digital jukebox platform market. Thus, the proposed Final Judgment would achieve substantially all the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VI.    STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the Court shall determine

whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1).

In making that determination, the Court shall consider:

    (1)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

    (2)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1). As the United States Court of Appeals for the D.C. Circuit has held, the APPA permits a court to consider, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See United States v. Microsoft*, 56 F.3d 1448, 1461-62 (D.C. Cir. 1995).

    "Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). Thus, in conducting this inquiry, "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement

of Senator Tunney).[2]  Rather,

> [a]bsent a showing of corrupt failure of the government to discharge its duty, the
> Court, in making its public interest finding, should . . . carefully consider the
> explanations of the government in the competitive impact statement and its
> responses to comments in order to determine whether those explanations are
> reasonable under the circumstances.

*United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D.

Mo. May 17, 1977).

Accordingly, with respect to the adequacy of the relief secured by the decree, a court may

not "engage in an unrestricted evaluation of what relief would best serve the public." *United*

*States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648

F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62.  Case law requires that

> [t]he balancing of competing social and political interests affected by a proposed
> antitrust consent decree must be left, in the first instance, to the discretion of the
> Attorney General.  The court's role in protecting the public interest is one of
> insuring that the government has not breached its duty to the public in consenting
> to the decree.  The court is required to determine not whether a particular decree
> is the one that will best serve society, but whether the settlement is "*within the
> reaches of the public interest.*"  More elaborate requirements might undermine
> the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[3]

---

[2]  *See also United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (recognizing
it was not the court's duty to settle; rather, the court must only answer "whether the settlement
achieved [was] within the reaches of the public interest").  A "public interest" determination can
be made properly on the basis of the Competitive Impact Statement and Response to Comments
filed pursuant to the APPA.  Although the APPA authorizes the use of additional procedures, 15
U.S.C. § 16(f), those procedures are discretionary.  A court need not invoke any of them unless it
believes that the comments have raised significant issues and that further proceedings would aid
the court in resolving those issues.  *See* H.R. Rep. No. 93-1463, 93rd Cong., 2d Sess. 8-9 (1974),
*reprinted* in 1974 U.S.C.C.A.N. 6535, 6538.

[3]  *Cf. BNS*, 858 F.2d at 463 (holding that the court's "ultimate authority under the [APPA] is
limited to approving or disapproving the consent decree"); *Gillette*, 406 F. Supp. at 716 (noting

The proposed Final Judgment, therefore, should not be reviewed under a standard of whether it is certain to eliminate every anticompetitive effect of a particular practice or whether it mandates certainty of free competition in the future. Court approval of a final judgment requires a standard more flexible and less strict than the standard required for a finding of liability. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *Gillette*, 406 F. Supp. at 716), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States might have but did not pursue. *Id.* at 1459-60.

---

that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

## VII.    **DETERMINATIVE DOCUMENTS**

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated:  September 2, 2005

Respectfully submitted,

_____

DAVID C. KULLY (DC Bar # 448763)
JILL A. BEAIRD

Attorneys for the United States
U.S. Department of Justice
Antitrust Division
Litigation III Section
325 Seventh Street, NW, Suite 300
Washington, DC 20530
(202) 305-9969 (telephone)
(202) 307-9952 (facsimile)
David.Kully@usdoj.gov