This process is conducted in accordance with 5 CFR 1320.10.

If you have comments especially on the estimated public burden or associated response time, suggestions, or need a copy of the proposed information collection instrument with instructions or additional information, please contact Anthony Purpura, United States Bomb Data Center, Federal Building, Suite 280, 650 Massachusetts Avenue, NW., Washington, DC 20226.

Written comments and suggestions from the public and affected agencies concerning the proposed collection of information are encouraged. Your comments should address one or more of the following four points:

—Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;
—Evaluate the accuracy of the agencies estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;
—Enhance the quality, utility, and clarity of the information to be collected; and
—Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses.

*Overview of this information collection:*

(1) *Type of Information Collection:* Extension of a currently approved collection.

(2) *Title of the Form/Collection:* Report of Theft or Loss of Explosives.

(3) *Agency form number, if any, and the applicable component of the Department of Justice sponsoring the collection:* Form Number: ATF F 5400.5. Bureau of Alcohol, Tobacco, Firearms and Explosives.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit. Other: None. Losses or theft of explosives must be reported by the state within 24 hours of the discovery of the loss or theft. This form contains the minimum information necessary for ATF to initiate criminal investigations.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* It is estimated that 150 respondents will complete the form within 1 hour and 48 minutes.

(6) *An estimate of the total public burden (in hours) associated with the collection:* There are an estimated 270 annual total burden hours associated with this collection.

*If additional information is required contact:* Brenda E. Dyer, Department Clearance Officer, Policy and Planning Staff, Justice Management Division, Department of Justice, Patrick Henry Building, Suite 1600, 601 D Street, NW., Washington, DC 20530, or e-mail to *brenda.e.dyer@usdoj.gov.*

Dated: September 13, 2005.

**Brenda E. Dyer,**
*Department Clearance Officer, Department of Justice.*
[FR Doc. 05–18676 Filed 9–19–05; 8:45 am]
**BILLING CODE 4410–FY–P**

# DEPARTMENT OF JUSTICE

## Antitrust Division

### Proposed Final Judgment and Competitive Impact Statement

### United States v. Ecast, Inc. and NSM Music Group, Ltd.

Notice is hereby given pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. section 16(b)–(h), that a Complaint, proposed Final Judgment, Stipulation, and Competitive Impact Statement have been filed with the United States District court for the District of Columbia in *United States* v. *Ecast, Inc. and NSM Music Group, Ltd.,* Civil Case No. 05 CV 1754. The proposed Final Judgment is subject to approval by the Court after compliance with the Antitrust Procedures and Penalties Act, 15 U.S.C. 16(b)–(h), including expiration of the statutory 60-day public comment period.

On September 2, 2005, the United States filed a Complaint alleging that Ecast, Inc. and NSM Music Group, Ltd. reached an agreement in February 2003 not to compete in the market for digital jukebox platforms in the United States in violation of Section 1 of the Sherman Act. As a result of the agreement, NSM terminated its plans to release a new digital jukebox with its own platform in the United States.

To restore competition, the proposed Final Judgment filed with the Complaint will terminate the defendants' existing noncompete agreement, and forbid them from entering future noncompete agreements with other digital jukebox platform competitors. A Competitive Impact Statement, filed by the United States, describes the Complaint, the proposed Final Judgment, and the remedies available to private litigants. Copies of the Complaint, proposed Final Judgment, and Competitive Impact Statement are available for inspection at the Department of Justice in Washington, DC in Room 215 North, 325 Seventh Street, NW., 20530 (telephone: 202/514–2692) and at the Office of the Clerk of the United States District Court for the District of Columbia, 333 Constitution Avenue, NW., Washington, DC 2001.

Public comment is invited within 60 days of the date of this notice. Such comments, and responses thereto, will be published in the **Federal Register** and filed with the Court. Comments should be directed to John Read, Chief, Litigation III Section, Antitrust Division, U.S. Department of Justice, 325 7th Street, NW., Suite 300, Washington, DC 20530 (Telephone (202) 616–5935).

**J. Robert Kramer, II**
*Director of Operations, Antitrust Division.*

### In the United States District Court for the District of Columbia

United States of America, Department of Justice, Antitrust Division, 325 7th Street, N.W.; Suite 300, Washington, DC 20530, Plaintiff, v. Ecast, Inc., 49 Geary Street, Mezzanine, San Francisco, CA 94108, and NSM Music Group, LTD. 3 Stadium Way, Elland Road, Leeds, West Yorkshire, United Kingdom, LS11 0EW, Defendants; Civil Case Number: 1:05CV01754, Judge: Colleen Kollar-Kotelly, Deck Type: Antitrust, Date Stamp: September 2, 2005.

**Complaint**

The United States of America, acting under the direction of the Attorney General of the United States, brings the civil antitrust action to obtain equitable relief against defendants Ecast, Inc. ("Ecast") and NSM Music Group, Ltd. ("NSM"), alleging as follows:

**Nature of the Action**

1. This action challenges an agreement between Ecast and NSM to not compete in the U.S. market for digital jukebox platforms.

2. A digital jukebox is an Internet-connected device installed in bars and restaurants that is capable of playing digital music files that are either stored on a hard drive inside the jukebox, or are downloaded from a remote server via the Internet. The jukebox consists of two primary components, a physical jukebox and a "platform," which is the term the industry applies to the combination of the software that powers the jukebox and the licensed collection of music that the jukebox is capable of playing at the request of bar or restaurant patrons.

3. At all time relevant to this complaint, defendant Ecast was one of

only two digital jukebox platform providers in the United States. Ecast does not manufacture physical jukeboxes and has instead elected to work with existing jukebox manufacturers. Ecast's manufacturing partners produce digital jukeboxes incorporating Ecast's platform and distribute the jukeboxes through their established distribution networks to "operators," which purchase the jukeboxes and install them in bars and restaurants.

4. In 2002, Ecast was informed by its then manufacturing partner of the manufacturer's plans to terminate its supply relationship with Ecast. Ecast turned to other jukebox manufacturers to avoid an interruption in the flow of digital jukeboxes powered by its platform into the digital jukebox marketplace.

5. At that time, defendant NSM, a jukebox manufacturer, was developing its own distinctive digital jukebox platform, which it planned to incorporate into its physical jukeboxes and release in the United States in competition with Ecast.

6. In the fall of 2002, Ecast initiated negotiations with defendant NSM regarding a possible manufacturing agreement. NSM expressed some interest in manufacturing digital jukeboxes incorporating Ecast's platform, but Ecast and NSM disagreed on how Ecast should compensate NSM in such a relationship. During the negotiations, Ecast requested that NSM agree to abandon its plans to enter the U.S. market in return for an upfront payment. NSM accepted Ecast's condition and entered an agreement with Ecast in February 2003.

7. NSM's agreement to manufacture only Ecast-powered digital jukeboxes caused it to abandon its plan to incorporate its own distinctive digital jukebox platform into its physical jukeboxes and enter the United States market.

8. Defendants' agreement constitutes an unreasonable agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. 1.

9. The United States seeks an order to prohibit defendants from enforcing and adhering to any agreement restraining competition between them and to obtain other equitable relief necessary to restore competition, potential or actual, for the benefit of digital jukebox purchasers throughout the United States.

**Jurisdiction and Venue**

10. The Court has subject matter jurisdiction under section 4 of the Sherman Act, 15 U.S.C. 4, and under 28 U.S.C. 1331 and 1337 to prevent and restrain the defendants from continuing to violate section 1 of the Sherman Act, 15 U.S.C. 1.

11. Venue is proper in this judicial district under section 12 of the Clayton Act, 15 U.S.C. 22, and under 28 U.S.C. 1391(b)(1), (c) because defendants transact or have transacted business here.

**Defendants**

12. Defendant Ecast, Inc. is a privately held company organized and existing under the laws of the State of Delaware, with is principal place of business in San Francisco, California.

13. Defendant NSM Musical Group, Ltd. is a company incorporated under the laws of the United Kingdom. Since 2002, NSM has offered a digital jukebox powered by an NSM platform in the United Kingdom. NSM's U.S. subsidiary, NSM Music, Inc., is based outside of Chicago, Illinois.

**Industry Background**

14. Digital jukeboxes emerged in the United States in 1997. Because of the advantages of digital jukeboxes both to consumers and to the "operators" that purchase the jukeboxes and install them (along with other coin-operated devices) in bars and restaurants, the pace of conversion from CD jukeboxes to digital jukeboxes is expected to increase rapidly.

15. Digital jukeboxes provide consumers access to a dramatically broader selection of music than they have available to them through CD jukeboxes. Jukeboxes powered by Ecast's platform, for example, allow consumers to choose from among 300 albums stored on each jukebox's hard drive. For an additional fee, consumers can download any of the additional 150,000 songs that Ecast stores on its remote servers. Consumers can also pay an additional fee to have their song choice jump to the front of the song queue. These features are not only popular with consumer users of digital jukeboxes, they also increase the revenue opportunities available to their operator purchasers.

16. After making a one-time payment to a jukebox distributor (the traditional intermediary between the manufacturer and the operator), operators then pay monthly fees to the platform provider to maintain access both to the music collection the platform provider licensed from U.S. copyright holders and to the proprietary software that allows the operator to remotely control the jukebox and the special features associated with it.

17. At all times relevant to the complaint, Ecast had only one other digital jukebox platform competitor, with which it competed on the monthly fee collected from operators. Ecast and its competitor each charged a monthly fee based on a percentage of the revenues generated by the jukebox. Ecast also competed on the special features available through jukeboxes incorporating its platform.

18. Under Ecast's business model, it sought to collaborate closely with and take advantage of the manufacturing expertise and distribution networks maintained by traditional jukebox manufacturers. Ecast believed that by combining the traditional jukebox companies' strengths with Ecast's Internet technology capabilities and the music collection it licensed from U.S. copyright holders, they could provide high-quality, Ecast-powered jukeboxes to the U.S. market more quickly than if Ecast had proceeded on its own.

19. Digital jukebox platforms provide to digital jukebox operators the software that powers digital jukeboxes and the music licensed from U.S. copyright holders that consumers can access through the jukebox. Because of the unique features and the enhanced revenue opportunities that digital jukeboxes offer to operators, if a hypothetical monopolist of digital jukebox platforms were to raise price by a small, but significant amount, digital jukebox manufacturers would not turn to other types of platforms (such as CD libraries). Neither would such a price increase cause operators of digital jukeboxes to switch to possible substitutes (such as CD jukeboxes). Additionally, if such a hypothetical digital jukebox platform monopolist raised its price, digital jukebox manufacturers that sold in the United States and operators that installed jukeboxes in the United States would not switch to platform providers that did not hold the necessary licenses to the U.S. copyrights associated with the music played by the jukebox.

*The Illegal Noncompete Agreement*

20. In the fall of 2002, defendant NSM was preparing to enter the U.S. digital jukebox market using its own platform in competition with Ecast and the other platform competitor. It had begun obtaining the U.S. copyright licenses necessary to provide a jukebox platform in the United States and had secured a line of credit to pay advances demanded by the copyright holders. NSM had also modified its U.K. jukebox and platform for release in the U.S. market, and it had completed a prototype of its planned

digital jukebox for demonstration at trade shows.

21. NSM saw a significant market opportunity to distinguish itself from Ecast and the other platform competitor by offering a more operator-friendly business model for the digital jukebox platform than the incumbents' revenue-sharing model. NSM's plan was to release a digital jukebox platform at a fixed monthly cost to operators. Operators had expressed interest in NSM's platform and several of them delayed purchases of jukeboxes incorporating Ecast's platform in anticipation of NSM's launch. NSM's commitment to a distinctive business model attractive to operators promised to generate competitive responses from the existing platform providers.

22. At an industry trade show in September 2002, NSM displayed a prototype of a digital jukebox and platform that it intended to release in the U.S. market. Ecast, having learned of its manufacturing partner's plans to terminate Ecast's only manufacturing relationship, approached NSM at the September 2002 trade show and proposed that NSM produce digital jukeboxes that would be powered by Ecast's platform.

23. Given its efforts to introduce a NSM-powered digital jukebox, NSM demanded appropriate compensation from Ecast before it would agree to assist Ecast by producing Ecast-powered digital jukeboxes. During subsequent negotiations, Ecast agreed to make a significant upfront cash payment to NSM in return for NSM's agreement to manufacture only East-powered digital jukeboxes and not compete against Ecast.

24. After those negotiations, Ecast forwarded a letter of intent to NSM. The December 31, 2002, letter of intent contained a provision that stated:

> NSM agrees that it will abandon its attempts to acquire music licenses for the U.S. market (the "Territory") and advise all content providers and licensors with which NSM has entered licenses with [sic] that it has abandoned entering the US market with its own digital music platform. NSM also agrees that for as long as Ecast offers the Ecast Platform in the Territory NSM will not produce a competing product in the Territory.

25. Ecast sought through the noncompete provision to prevent NSM from entering and disrupting the digital jukebox platform marketplace. NSM's board thereafter approved the deal with Ecast that included the noncompete provision as quoted above.

26. After agreeing with Ecast to manufacture Ecast-powered jukeboxes exclusively and not to proceed with its own entry into the U.S. platform market, NSM fired the two employees that had been responsible for its planned entry. Upon learning of NSM's action, Ecast reneged on its deal with NSM and refused to make the upfront payment to NSM as previously promised.

27. Ecast and NSM subsequently negotiated a second agreement that also contained a noncompete provision obligating NSM to produce only Ecast-powered digital jukeboxes. The second agreement also called for Ecast to make a smaller upfront payment to NSM and contained a license by NSM to Ecast of a patent relating to digital jukebox technology.

28. NSM did not, and has not, entered the U.S. market with its own digital jukebox using its platform. Its presence in the United States is only as a manufacturer and distributor of CD jukeboxes and digital jukeboxes powered by Ecast's platform.

**Cause of Action (Violation of Section 1 of the Sherman Act)**

29. The United States hereby incorporates paragraphs 1 through 28.

30. The anticompetitive effects of defendants' noncompete agreement outweigh any procompetitive benefits offered by that agreement.

31. The noncompete agreement prevented NSM from entering the market for digital jukebox platforms and denied to U.S. operators and jukebox users the benefits of competition among NSM and existing participants in the market. The noncompete agreement offered few, if any, procompetitive benefits to weigh against the harm to U.S. consumers.

32. Defendants' agreement unreasonably restrained competition in the digital jukebox platform market in violation of Section 1 of the Sherman Act, 15 U.S.C. 1.

**Requested Relief**

The United States requests that:
(A) The Court adjudge and decree that 6the defendants' agreement not to compete constitutes an illegal restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act;
(B) The defendants be permanently enjoined and restrained from enforcing or adhering to existing contractual provisions that restrict competition between them;
(C) Each defendant be permanently enjoined and restrained from establishing any agreement restricting competition between it and another digital jukebox platform competitor;
(D) The United states be awarded such other relief as the Court may deem just and proper to redress and prevent recurrence of the alleged violation and to dissipate the anticompetitive effects of Ecast's and NSM's illegal agreement; and

(D) The United States be awarded the costs of this action.

Dated: September 2, 2005.

Thomas O. Barnett,
*Acting Assistant Attorney General.*

J. Robert Kramer II,
*Director of Operations.*

John R. Read,
*Chief.*

Nina Hale,
*Assistant Chief, Litigation III.*

David C. Kully (DC Bar #448763),

Jill A. Beaird,
*Attorneys for the United States, United States Department of Justice, Antitrust Division, 325 7th Street, NW; Suite 300, Washington, DC 20530, Telephone: (202) 305–9969, Facsimile: (202) 307–9952.*

**In the United States District Court for the District of Columbia**

**United States of America, Plaintiff, v. Ecast, Inc. and NSM Music Group, Ltd., Defendants; Civil No.: 05 1754**

**Proposed Final Judgment**

*Whereas,* the United States of America filed its Complaint on September 2, 2005, alleging that defendants Ecast, Inc. ("Ecast") and NSM Music Group, Ltd. ("NSM") entered into an agreement in violation of Section 1 of the Sherman Act, and plaintiff and defendants, by their respective attorneys, have consent to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against, or any admission by, any party regarding any such issue of fact or law;

*And whereas,* Ecast and NSM agree to be bound by the provisions of this Final Judgment pending its approval by this Court;

*And whereas,* the essence of this Final Judgment is the prevention of future conduct by Ecast and NSM that impairs competition in the digital jukebox platform market;

*And whereas,* the United States requires Ecast and NSM to agree to certain procedures and prohibitions for the purpose of preventing the loss of competition;

*Now therefore,* before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is *ordered, adjudged, and decreed:*

**I. Jurisdiction**

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against Ecast and NSM under Section 1 of the Sherman Act, as amended, 15 U.S.C. 1.

**II. Definitions**

As used in this Final Judgment:

A. ''Digital Jukebox'' means a commercial vending device that upon payment plays for public performance digital music files that are delivered electronically from a remote server and stored on any internal or connected data storage medium.

B. ''Digital Jukebox Platform competitor'' means any natural person, corporate entity, partnership, association, or joint venture that has licensed (or that Ecast or NSM knows or has reason to believe has plans to license) a collection of digital music files from U.S. copyright holders for the purpose of supplying music content in the United States to a Digital Jukebox.

C. ''Ecast'' means defendant Ecast, Inc., a privately held company organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their officers, managers, agents, employees, and directors acting or claiming to act on its behalf.

D. ''NSM'' means defendant NSM Music Group, Ltd., a company incorporated under the laws of the United Kingdom, its successor and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their officers, managers, agents, employees, and directors acting or claiming to act on its behalf.

**III. Applicability**

This Final Judgment applies to Ecast and NSM, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

**IV. Prohibited and Required Conduct**

1. Each defendant, its officers, directors, agents, and employees, acting or claiming to act on its behalf, and successors and all other persons acting or claiming to act on its behalf, are enjoined and restrained from directly or indirectly adhering to or enforcing section 4 (''EXCLUSIVITY'') of defendants' September 2003 ''Manufacturing License, Distribution License and Patent License Agreement,'' or from in any manner, directly or indirectly, entering into, continuing, maintaining, or renewing any contractual provision that prohibits NSM from becoming or limits NSM's ability to become a Digital Jukebox Platform Competitor.

2. Each defendant, its officers, directors, agents, and employees, acting or claiming to act on its behalf, and successors and all other persons acting or claiming to act on its behalf, are enjoined and restrained from, in any manner, directly or indirectly, entering into, continuing, maintaining, or renewing any agreement with any Digital Jukebox Platform Competitor that prohibits such person from supplying or limits the ability of such person to supply music content in the United States to Digital Jukeboxes, provided however, that (a) any merger or acquisition involving either defendant; (b) any valid license of U.S. Patent No. 5,341,350 from either defendant to a nonparty; or (c) any valid license of U.S. patent No. 5,341,350 from NSM to Ecast, which does not in any way prohibit NSM from becoming or limit NSM's ability to become a Digital Jukebox Platform Competitor, will not be considered, by itself, a violation of this paragraph.

**V. Compliance Program**

1. Each defendant shall establish and maintain an antitrust compliance program which shall include designating, within thirty days of entry of this Final Judgment, an Antitrust Compliance Officer with responsibility for implementing the antitrust compliance program and achieving full compliance with this Final Judgment and the antitrust laws. The Antitrust Compliance Officer shall, on a continuing basis, be responsible for the following:

a. Furnishing a copy of this Final Judgment within thirty days of entry of the Final Judgment to each defendant's officers, directors, and employees;

b. Furnishing within thirty days a copy of this Final Judgment to any person who succeeds to a position described in Section V.1.a;

c. Arranging for an annual briefing to each person designated in Section V.1.a or b on the meaning and requirements of this Final Judgment and the antitrust laws;

d. Obtaining from each person designated in Section V.1.a or b certification that he or she (1) has read and, to the best of his or her ability, understands and agrees to abide by the terms of this Final Judgment; (2) is not aware of any violation of the Final Judgment that has not been reported to the Antitrust Compliance Officer; and (3) understands that any person's failure to comply with this Final Judgment may result in an enforcement action for civil or criminal contempt of court against each defendant and/or any person who violates this Final Judgment;

e. Maintaining (1) a record of certifications received pursuant to this Section; (2) a file of all documents related to any alleged violation of this Final Judgment and the antitrust laws; and (3) a record of all communications related to any such violation, which shall identify the date and place of the communication, the persons involved, the subject matter of the communication, and the results of any related investigation;

f. Reviewing the content of each e-mail, letter, memorandum, or other communication to any Digital Jukebox Platform Competitor written by or on behalf of an officer or director of either defendant that relates to the recipient's supply of music content in the United States to Digital Jukeboxes in order to ensure their adherence with this Final Judgment.

2. If defendant's Antitrust Compliance Officer learns of any violations of any of the terms and conditions contained in this Final Judgment, defendant shall immediately take appropriate action to terminate or modify the activity so as to comply with this Final Judgment.

**VI. Compliance Inspection**

1. For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained or designated thereby, shall, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable written notice to defendants, be permitted:

a. Access during defendants' office hours to inspect and copy, or at the United States' option, to require defendants to provide copies of, all books, ledgers, accounts, records, and documents in their possession, custody, or control relating to any matters contained in this Final Judgment; and

b. To interview, either informally or on the record, defendant's officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable

convenience of the interviewee and without restraint or interference by defendants.

2. Upon the written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, defendants shall submit written reports, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

3. No information or documents obtained by the means provided in this section shall be divulged by plaintiffs to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

4. If at the time defendants furnish information or documents to the United States, they represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall use its best efforts to give defendants ten calender days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

### VII. Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

### VIII. Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

### IX. Notice

For purposes of this Final Judgment, any notice or other communication shall be given to the persons at the addresses set forth below (or such other addresses as they may specify in writing to Ecast or NSM): John Read, Chief, Litigation III Section, U.S. Department Of Justice, Antitrust Division, 325 Seventh Street, NW., Suite 300, Washington, DC 20530.

### X. Public Interest Determination

Entry of this Final Judgment is in the public interest.

Dated: _____

Court approved subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. 16 *United States District Judge.*

---

**In the United States District Court for the District of Columbia**

United States of America, Department of Justice, Antitrust Division, 325 7th Street, NW.; Suite 300, Washington, DC 20530, Plaintiff, v. Ecast, Inc., 49 Geary Street, Mezzanine, San Francisco, CA 94108, and NSM Music Group, Ltd., 3 Stadium Way, Elland Road, Leeds, West Yorkshire, United Kingdom LS11 OWE, Defendants; Civil Case Number 1:05CV01754, Judge: Colleen Kollar-Kotelly, Deck Type: Antitrust, Date Stamp: September 2, 2005.

**Competitive Impact Statement**

The United States, pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA"), 15 U.S.C. 16(b), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

On September 2, 2005, the United States filed a civil antitrust Complaint pursuant to section 4 of the Sherman Act, as amended, 15 U.S.C. 4, against Ecast, Inc. ("Ecast") and NSM Music Group, Ltd. ("NSM"). The Complaint alleges that defendants entered into a noncompete agreement that caused NSM not to proceed with its plans to enter the U.S. digital jukebox platform market and compete with Ecast. That agreement, as the Complaint further alleges, is a restraint of interestate trade in violation of Section 1 of the Sherman Act, 15 U.S.C. 1.

The Complaint seeks an order to prohibit defendants from enforcing or adhering to any agreement restraining competition between them, and other equitable relief necessary to prevent a recurrence of the illegal conduct.

The United States filed simultaneously with the Complaint a proposed Final Judgment, which constitutes the parties' settlement. This proposal Final Judgment seeks to prevent defendants' illegal conduct by expressly enjoining them from enforcing or adhering to their existing noncompete agreement, prohibiting them from establishing future noncompete agreements with digital jukebox platform competitors, and requiring each to establish a rigorous antitrust compliance program.

The United States, Ecast, and NSM have stipulated that the proposed Final Judgment may be entered after compliance with the APPA, unless the United States withdraws its consent. Entry of the proposed Final Judgment would terminate this action, except that this Court would retain jurisdiction to construe, modify, and enforce the proposed Final Judgment and to punish violations thereof.

### I. Description of the Events Giving Rise to the Alleged Violation of the Antitrust Laws

*A. Defendants*

I. Ecast

Ecast is a San Francisco-based, privately held company organized under the laws of the State of Delaware. It developed a digital jukebox platform that supplies the software and music for jukeboxes manufactured by traditional jukebox manufacturers. Ecast refers to jukeboxes that incorporate its platform as "powered by Ecast."

2. NSM

NSM is a jukebox manufacturer based in the United Kingdom. It conducts business in the United States through its operating subsidiary, NSM Music, Inc., based outside of Chicago, Illinois.

*B. The Digital Jukebox Industry*

Digital jukeboxes are Internet-connected devices installed in bars and restaurants that are capable of playing digital music files that are either stored on a hard drive inside each jukebox or are downloaded from a remote server via the Internet. Digital jukeboxes consist of two primary components, a physical jukebox and a "platform," which is the term the industry applies to the combination of the software that powers the jukebox and the licensed collection of music that the jukebox is capable of playing.

As is the case with CD jukeboxes and most other coin-operated devices found in bars and restaurants, digital jukeboxes are purchased, installed, and maintained by 3,000, mostly local businesses called "operators." Operators purchase both CD and digital jukeboxes from distributors, which maintain relationships with jukebox manufacturers.[1] When operators elect to purchase a digital jukebox, they incur— in addition to the one-time, out-of-pocket payment to the distributor—an obligation to make recurring monthly payments to the platform provider to

---

[1] Operators then negotiate with bars and restaurants for space in their establishments in which to place the digital jukeboxes.

maintain continuous access to the provider's proprietary software and to the music collection that the platform provider licensed from U.S. copyright holders.

There are roughly 15,000 digital jukeboxes in the United States. The popularity of digital jukeboxes to consumers, and their ability to generate greater revenue for the operator than CD jukeboxes, lead many in the industry to predict the pace of digital jukebox adoption to increase in the coming years.

Digital jukeboxes offer consumers a song selection dramatically larger than CD jukeboxes. Ecast, for example, preloads jukeboxes incorporating its platform with 300 albums, but also permits consumers to access, for a higher price, a licensed collection of 150,000 additional songs that it stored on its remote servers. Ecast-powered jukeboxes also allow consumers to pay to jump to the front of the song queue. Because operators can control the song selection on their digital jukeboxes from a remote location over the Internet, digital jukeboxes also relieve operators of the need to visit each their jukeboxes to load new releases or holiday favorites.

Ecast released its platform in the United States in 2001. It did so under an agreement with a jukebox manufacturer, which manufactured and distributed (through the manufacturer's established chain of distributors) digital jukeboxes incorporating the Ecast platform. When the manufacturer notified Ecast in 2002 that it intended to terminate their agreement, Ecast immediately sought to avoid an interruption in the delivery of Ecast-powered digital jukeboxes to the U.S. market by finding another manufacturer partner.

*C. The Illegal Noncompete Agreement*

At a September 2002 industry trade show, NSM displayed a prototype of a digital jukebox and platform that it intended to release in the U.S. market. By that time, NSM was actively negotiating with U.S. copyright holders to obtain the license it needed to provide music to consumers through its digital jukebox platform, and had secured a line of credit to pay advances typically demanded by the copyright holders. NSM had also modified the digital jukebox and platform it had previously released in the United Kingdom for release in the United States. It had publicly communicated its intention to enter the U.S. market, and it was internally committed to proceeding with those plans.

Ecast approached NSM at the September 2002 industry trade show and proposed that NSM produce digital jukeboxes which would be powered by Ecast's platform. During subsequent negotiations, Ecast agreed to make a significant upfront payment to NSM, provided that NSM abandon its entry plans in the U.S. and agree not to compete against Ecast. After further negotiations on those terms, Ecast submitted to NSM a letter of intent calling for an upfront payment by Ecast of $700,000, and containing the following noncompete agreement:

NSM agrees that it will abandon its attempts to acquire music licenses for the U.S. market (the ''Territory'') and advise all content providers and licensors with which NSM has entered licenses with [sic] that it has abandoned entering the US market with its own digital music platform. NSM also agrees that for as long as Ecast offers the Ecast Platform in the Territory NSM will not produce a competing product in the Territory.

To Ecast, the principal motivation for requesting the noncompete provision was to prevent NSM from entering and disrupting the digital jukebox platform market. NSM went ahead and approved the deal with Ecast that included the above-quoted noncompete provision.

Pursuant to the agreement, NSM thereafter ceased all efforts to enter the U.S. market with its own digital jukebox platform. NSM also fired the two employees responsible for its planned entry. Those employees were the only NSM representatives involved in its copyright license negotiations, its successful efforts to obtain financing necessary to pay advances to copyright holders, and its communications with U.S. operators and distributors concerning NSM's impending U.S. entry.

Ecast recognized that without those employees, NSM no longer possessed the ability to enter quickly with its own platform. Ecast then refused to pay NSM the full $700,000 as agreed. Ecast and NSM subsequently renegotiated the terms of their agreement such that NSM would remain prohibited from entering the U.S. market with its own digital jukebox platform with smaller payments from Ecast. The revised agreement also included a license by NSM to Ecast of a patent concerning digital jukebox technology.

*D. Defendants' Noncompete Agreement Is an Unreasonable Restraint of Trade*

Noncompete agreements between competitors can violate Section 1 of the Sherman Act. In this case, the noncompete agreement was entered into in conjunction with an agreement to jointly produce and distribute a product. The Department analyzed this noncompete agreement pursuant to the rule of reason because it was reasonably related to the venture and enhanced its efficiency. Under the rule of reason, the Department considers ''all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.'' *Chicago Bd. of Trade* v. *United States*, 246 U.S. 231, 238 (1918). After consideration of the circumstances in this case, the Department concluded that the noncompete agreement significantly suppressed competition and that harm to competition outweighed the procompetitive benefits of the agreement.

The noncompete agreement between Ecast and NSM forced NSM to abandon its efforts to enter the U.S. market with its own digital jukebox platform. Many operators had expressed great interest in NSM's entry because NSM intended to utilize a more attractive pricing model for its jukebox platform (a flat-price model as opposed to a percentage-or-revenue model) than either Ecast or its only U.S. platform competitor. This and other significant potential benefits to consumers were eliminated by the noncompete provision. The procompetitive benefits of the venture were very limited. Accordingly, the Department concluded that the anticompetitive effects of the noncompete agreement outweighed the procompetitive effects.

**II. Explanation of the Proposed Final Judgment**

The Antitrust Division typically seeks, through an enforcement action, to restore the competitive conditions that existed prior to defendants' establishment of their illegal agreement. The Antitrust Division cannon require NSM to enter the U.S. digital jukebox platform market, but believes it is important to eliminate the artificial impediments to NSM's ability to do so in the future. The proposed Final Judgment thus enjoins defendants from enforcing or adhering to this or any other noncompete agreement that restricts NSM's entry into the U.S. digital jukebox platform market. The proposed Final Judgment also prohibits defendants from establishing noncompete agreements with other digital jukebox platform competitors and imposes a rigorous antitrust compliance program upon each defendant.

### III. Remedies Available to Potential Private Litigants

Section 4 of the Clayton Act, 15 U.S.C. 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in a federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorney's fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under provisions of section 5(a) of the Clayton Act, 15 U.S.C. 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent lawsuit that any private party may bring against the defendants.

### IV. Procedures Available for Modification of the Proposed Final Judgment

The United States and the defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within 60 days of the date of publication of this competitive Impact Statement in the **Federal Register**. The United States will evaluate and respond to the comments. All comments will be given due consideration by the United States, through the Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to entry. The comments and the response of the United States will be filed with the Court and published in the **Federal Register**. Written comments should be submitted to John Read, Chief, Litigation III Section, Antitrust Division, United States Department of Justice, 325 Seventh Street, NW., Suite 300, Washington, DC 20530.

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

### V. Alternative to the Proposed Final Judgment

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits of its Complaint against the defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against Ecast and NSM. However, the United States is satisfied that the relief provided in the proposed Final Judgment will prevent a recurrence of conduct that restricted competition in the digital jukebox platform market. Thus, the proposed Final Judgment would achieve substantially all the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

### VI. Standard of Review Under the APPA for the Proposed Final Judgment

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. 16(e)(1). In making that determination, the Court shall consider:

(1) The competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(2) The impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. 16(e)(1). As the United States Court of Appeals for the D.C. Circuit has held, the APPA permits a court to consider, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See United States* v. *Microsoft*, 56 F.3d 1448, 1461–62 (D.C. Cir. 1995).

"Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. 16(e)(2). Thus, in conducting this inquiry, "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney).[2] Rather,

[a]bsent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should * * * carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.

*United States* v. *Mid-Am. Dairymen, Inc.*, 1977–1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. May 17, 1977).

Accordingly, with respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States* v. *BNS, Inc.*, 858 5.2d 456, 462 (9th Cir. 1988) (citing *United States* v. *Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also* Microsoft, 56 F.3d at 1460–62. Case law requires that

[t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is *"within the reaches of the public interest."* More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel,* 648 F.2d at 666 (emphasis added) (citations omitted).[3]

---

[2] *See also United States* v. *Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (recognizing it was not the court's duty to settle; rather, the court must only answer "whether the settlement achieved [was] within the reaches of the public interest"). A "public interest" determination can be made properly on the basis of the Competitive Impact Statement and Response to Comments filed pursuant to the APPA. Although the APPA authorizes the use of additional procedures, 15 U.S.C. 16(f), those procedures are discretionary. A court need not invoke any of them unless it believes that the comments have raised significant issues and that further proceedings would aid the court in resolving those issues. *See* H.R. Rep. No. 93–1463, 93rd Cong., 2d Sess. 8–9 (1974), reprinted in 1974 U.S.C.C.A.N. 6535, 6538.

[3] Cf. BNS, 858 F.2d at 463 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *Gillette,* 406 F. Supp. at 716 (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a

Continued

The proposed Final Judgment, therefore, should not be reviewed under a standard of whether it is certain to eliminate every anticompetitive effect of a particular practice or whether it mandates certainty of free competition in the future. Court approval of a final judgment requires a standard more flexible and less strict than the standard required for a finding of liability. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls with the range of acceptability or is 'within the reaches of public interest.'" *United States* v. *Am. Tel. & Tel. Co.,* 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting Gillette, 406 F. Supp. at 716), aff'd sub nom. *Maryland* v. *United States,* 460 U.S. 1001 (1983); *see also United States* v. *Alcan Aluminum Ltd.,* 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Compliant, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft,* 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the compliant" to inquire into other matters that the United States might have but did not pursue. *Id.* at 1459–60.

### VII. Determinative Documents

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: September 2, 2005.

Respectfully submitted,

David C. Kully (DC Bar #448763),

Jill A. Beaird,

*Attorneys for the United States, U.S. Department of Justice, Antitrust Division, Litigation III Section, 325 Seventh Street, NW., Suite 300, Washington, DC 20530, (202) 305–9969 (telephone), (202) 307–9952 (facsimile), David.Kully@usdoj.gov.*

[FR Doc. 05–18498 Filed 9–19–05; 8:45 am]

**BILLING CODE 4410–11–M**

microscope, but with an artist's reducing glass"). *See generally Microsoft,* 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charges as to fall outside of the 'reaches of the public interest' ").

# DEPARTMENT OF LABOR

## Mine Safety and Health Administration

## Petitions for Modification

The following parties have filed petitions to modify the application of existing safety standards under section 101(c) of the Federal Mine Safety and Health Act of 1977.

### 1. Kingwood Mining Company, LLC

[Docket No. M–2005–062–C]

Kingwood Mining Company, LLC, Route 1 Box 294C, Newburg, West Virginia 26410 has filed a petition to modify the application of 30 CFR 75.364(b)(1) (Weekly examination) to its Whitetail K-Mine (MSHA I.D. No. 46–08751) located in Preston County, West Virginia. The petitioner requests a modification of the existing standard to permit monitoring stations to be established for the left side entries (looking inby) from the belt entry over of South Mains #2 at #8 crosscut to South Mains #4 at #9 crosscut due to deteriorating roof conditions. The petitioner proposes to establish monitoring stations (MS–S1, S2, S3, & S4) at inlet entries (MS–S3 and S4) at South #4 between #9–#10 crosscut and the outlet entries (MS–S1 and S2) at South #2 between #6–#7 crosscut. The petitioner will have a certified person examine the monitoring stations on a weekly basis for air quantity, quality, and direction, and record the results of the examination in a book. The petitioner will also examine the stopping line between the belt entry and the intake air entry area in question from the South Mains #2 at #4 crosscut to South Mains #4 at #9 crosscut each production day for integrity, and record the results in the daily belt examiners book. The petitioner asserts that the proposed alternative method would provide at least the same measure of protection as the existing standard.

### 2. Mach Mining, LLC

[Docket No. M–2005–063–C]

Mach Mining, LLC, P.O. Box 300, Johnston City, Illinois 62951 has filed a petition to modify the application of 30 CFR 75.1909(b)(6) (Nonpermissible diesel-powered equipment; design and performance requirements) to its Mach #1 Mine (MSHA I.D. No. 11–03141) located in Williamson County, Illinois. The petitioner proposes to operate the Getman Roadbuilder as it was originally designed without front brakes. The petitioner will provide training to the grader operators on lowering the moldboard for additional stopping capability in emergency situations; train operators to recognize the appropriate speeds to use on different roadway conditions; and limit the maximum speed of the Roadbuilder to 10 miles per hour. The petitioner asserts that the proposed alternative method would provide at least the same measure of protection as the existing standard.

### Request for Comments

Persons interested in these petitions are encouraged to submit comments via Federal eRulemaking Portal: *http://www.regulations.gov*; E-mail: *zzMSHA-Comments@dol.gov;* Fax: (202) 693–9441; or Regular Mail/Hand Delivery/Courier: Mine Safety and Health Administration, Office of Standards, Regulations, and Variances, 1100 Wilson Boulevard, Room 2350, Arlington, Virginia 22209. All comments must be postmarked or received in that office on or before October 20, 2005. Copies of these petitions are available for inspection at that address.

Dated at Arlington, Virginia, this 15th day of September 2005.

**Rebecca J. Smith,**

*Acting Director, Office of Standards, Regulations, and Variances.*

[FR Doc. 05–18738 Filed 9–19–05; 8:45 am]

**BILLING CODE 4510–43–P**

# NATIONAL SCIENCE FOUNDATION

## Notice of Intent To Seek Approval To Extend an Information Collection

**AGENCY:** National Science Foundation (NSF).

**ACTION:** Notice and request for comments.

**SUMMARY:** The National Science Foundation (NSF) is announcing plans to request clearance of this collection. In accordance with the requirement of Section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 (Pub. L. 104–13), we are providing opportunity for public comment on this action. After obtaining and considering public comment, NSF will prepare the submission requesting that OMB approve clearance of this collection for no longer than three years.

**DATES:** Written comments on this notice must be received by November 21, 2005 to be assured of consideration. Comments received after that date will be considered to the extent practicable.

**FOR FURTHER INFORMATION CONTACT:** Suzanne H. Plimpton, Reports Clearance Officer, National Science Foundation, 4201 Wilson Boulevard, Suite 295, Arlington, Virginia 22230; telephone (703) 292–7556; or send e-mail to